10/26/2026 3:30 PM
26CV60981

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF MULTNOMAH**

| | |
|---|---|
| LEIF M. SCHJEIDE and ANNA POSPESHNAYA, | Case No. __________________ |
| Plaintiffs, | COMPLAINT |
| v. | Civil Rights — 42 U.S.C. § 1983; Intentional Infliction of Emotional Distress |
| SYDNEY HARPER and PHONE M. KYAW, each in an individual capacity; and CITY OF PORTLAND, | Damages: $3,500,000 |
| Defendants. | JURY TRIAL DEMANDED |

Filing fee: $884 under ORS 21.160(1)(d).

Not subject to mandatory arbitration; amount exceeds $50,000.

**PARTIES, JURISDICTION, AND VENUE**

1.

Plaintiffs Leif M. Schjeide and Anna Pospeshnaya reside at 4316 NE 11th Avenue in Portland, Multnomah County, Oregon.

2.

Defendants Sydney Harper and Phone M. Kyaw were City of Portland police officers. During the conduct described below, each exercised police authority under color of state law and acted within the scope of City employment. The City of Portland is an Oregon municipal corporation.

3.

The challenged conduct occurred in Multnomah County on September 2, 2026, and in the associated police reporting. This Court has jurisdiction over the federal claims under 42 U.S.C. § 1983 and the Oregon tort claims. Venue is proper in Multnomah County.

**FACTUAL ALLEGATIONS**

4.

Terri Nelson, Leif's neighbor, was a homeowner at the property where the landscaping workers were working. On September 2, 2026, she called 911 about Leif and told the dispatcher, "He likes to yell about Trump." The dispatcher responded, "Okay. It's not relevant," and returned to questions about the ongoing incident. Harper and Kyaw responded to Terri's complaints concerning Leif and the workers.

5.

During a telephone call, Harper asked Terri whether the dispute was "a mental health thing." Harper later asked what was wrong with having gardeners. Terri answered, "The first time around when he stormed into my backyard, he was yelling something about how he voted for Trump twice." She added, "The gardeners have their own suspicions." Harper replied, "I'm picking up what you're putting down," and said, "he doesn't like gardeners for that reason," qualified by "maybe" and "maybe not."

6.

Terri then said the gardeners were Hispanic but looked white, asserted that this "confused him," and attributed his fentanyl accusation to their sun hoodies and sunglasses. Harper responded that "it might be like a mental health thing." The call supplied allegations about Leif's beliefs and mental condition, rather than an identified statement by him establishing the asserted ethnic confusion or a clinical basis for the mental-health inference.

7.

During that same call, Terri reported another return to her door. After telling Leif that police were coming, she told Harper that he "just answered like he was normal" and quoted his response: "Oh, okay. Just checking." Harper asked whether Leif wanted the police to come. Terri said yes and explained that he intended to seek a restraining order against her and the gardeners.

8.

On scene, Harper asked to interview the workers directly, explaining that she could not testify to what they said without speaking with them. She told Terri that trespass or harassment would result in a citation because the jail was not booking those charges. This discussion occurred before Leif first approached the officers.

9.

Before Leif's first approach to the officers, Kyaw advised the landscaping company's owner about obtaining a restraining order, including how to articulate why Leif was a danger to people or property occupants. Kyaw said he could not put words in the owner's mouth and acknowledged that a judge might reject the request. The owner was not an eyewitness to the initial September encounter.

10.

Leif initially asked whether police had obtained the workers' names and addresses and explained that he needed a police report to seek a restraining order. Harper offered a phone number to call for the report. When Leif asked for a pen and for the number to be written down, Harper responded, "I can't give you their information." Leif clarified, "No, the phone number," and repeated that he wanted just the phone number. The officers ultimately provided a card bearing the incident number.

11.

When Harper attempted to begin questioning, Leif said, "I have nothing to say to you," and again requested the phone number. Harper threw her hands in the air and responded, "Great. You have no statement."

12.

After Leif returned home, Harper interviewed the workers about physical contact, injuries, and the alleged fentanyl remark. A worker demonstrated contact, and Harper asked, "So he hugged you?" The worker agreed and said Leif put both arms around him. Harper did not ask whether any worker had heard Leif mention Trump or voting, what words were used, or the basis for the suspicions Terri attributed to the gardeners. No worker confirmed the political allegation in those interviews.

13.

During these interviews, Kyaw continued speaking separately with the company's owner. Kyaw said that reasonable action could be taken when a person felt their life was in danger, but emphasized that the action must be reasonable in the eyes of their peers. The owner described several workers showing restraint toward one man and said Leif would eventually "push it too

far." Kyaw responded that Leif would encounter "the wrong person one day" and then call police "claiming to be the victim," while attributing the initiation of that future encounter to Leif.

14.

The owner then said pressing charges was appropriate because something needed to get into Leif's head. Kyaw acknowledged that Harper was the primary officer making charging decisions, but answered, "I'm on the same page with you on that," and described enforcement as a "time out" that gives people a "reality check." Kyaw warned that arrest did not mean a sentence and that release could occur within hours. He recommended a restraining order as the safest avenue, explained that deputies would serve its conditions and that violations could lead to mandatory arrest, and predicted that Leif would "probably stay in jail a little bit longer" until seeing a judge.

15.

As the porch discussions concluded, Harper described the alleged contact as a "bear hug"; Kyaw subsequently repeated that phrase. Harper was the first recorded speaker to add "bear" to the earlier description. She invited questions from the homeowners and workers, including "Do you have any questions?", checked that they had business cards, and discussed next steps. Harper then told the homeowners and workers, "He's very fixated on you guys. He wants your names and addresses." She did not tell them in that exchange that Leif had requested the information to seek a restraining order, a purpose already known to her as described in paragraphs 7 and 10.

16.

When Leif later left his home with his dog, Kyaw asked, "Hey Leif, can we have a conversation?" Leif twice answered, "No." Kyaw then commanded, "Well, come over here." Neither officer had declared a detention or arrest.

17.

Leif challenged Kyaw's authority to give that command and told Kyaw not to tell him what to do. Kyaw responded that the officers had received a call about Leif making "questionable choices" and were trying to figure it out.

18.

Leif subsequently left to walk the dog. Harper and Kyaw came to Plaintiffs' door while he was away. Harper repeatedly rang and banged on the door.

19.

Anna works from home as a certified public accountant. The banging interrupted her work. She had been uninvolved in the dispute and did not know why police were at her door.

20.

While at the door, before Anna answered, Harper mocked Leif's earlier "I have nothing to say" refusal by saying "Nothing to say" in a contemptuous tone. Before Anna answered, Harper also held a hand at her holstered firearm.

21.

Anna told Harper that Leif was walking the dog. Harper angrily rejected that truthful explanation: "He was here. He went back inside with the dog. We watched it."

22.

Anna asked what the matter was about. Harper answered, “I can’t hand it to you,” although Anna had not asked to receive the citation. Harper cut off Anna’s attempt to clarify her question.

23.

Harper told Anna she was citing Leif for trespass and asserted that police had spoken to him on June 23 and told him he was not allowed to return to the neighbor’s property. Police had not excluded Leif from that property on June 23.

24.

Anna asked which property Harper meant. Harper responded that the matter needed to be handled with Leif and that she did not need to walk Anna through the entire process. Without an intervening response from Anna, Harper continued explaining the accusations. Harper interrupted Anna’s questions and declined to walk her through the process.

25.

Harper stated that Leif had touched someone without consent, bear-hugged the person, and bumped the person’s chest. She presented those accusations as established facts while interrupting Anna’s questions. As Anna returned inside and afterward, Harper appeared visibly frustrated and repeatedly folded and creased the citation with both hands. Anna’s perception of Harper’s demeanor and its effect on her are described in paragraph 47.

26.

After Anna returned inside, the officers spoke quietly, including whispered portions, outside Plaintiffs’ door. Portions of this exchange are difficult to discern or incomplete on the body-camera recordings but are captured more clearly by Plaintiffs’ Ring camera. They

discussed a "50–50" chance that Leif would come to the door. In Plaintiffs' transcription, Harper said, "He's not coming," and Kyaw replied, "It's good to be optimistic sometimes." Kyaw then said, "I should've just grabbed him." Harper agreed: "I know, yeah." Kyaw also referred to uncertainty about whether the dog would be friendly. Harper had already determined that the jail would not book these charges and planned a citation; the officers nevertheless continued discussing the offense classification. They did not actually grab Leif or force entry.

27.

While the officers remained outside the home, Kyaw speculated that Leif's behavior was "a mental-health thing."

28.

Kyaw next said that he did not think Leif used drugs because Leif did not look like someone who used drugs.

29.

Harper responded to that speculation by describing Leif as a Trump supporter: "He's a Trump fan, and he doesn't like them." She offered the supposed political affiliation as an explanation for his behavior toward the workers and homeowners. Her explanation repeated and developed the political theory she had entertained during Terri's earlier telephone account.

30.

Kyaw questioned Harper's characterization, asking whether Leif was a Trump supporter. Harper continued the political explanation, attributed it to what others were saying, and stated that she did not know whether it was true. Harper repeated that explanation after interviewing the workers without obtaining confirmation of the political allegation in those recorded interviews.

Despite her acknowledged uncertainty, she continued using the political label to explain Leif's behavior.

31.

The officers' political discussion then referred to "this family," followed by Kyaw's "All of them?" and Harper's "Yeah," as transcribed by Plaintiffs from their Ring recording. Terri had alleged that Leif yelled about voting for Trump twice; she had not claimed that Anna or the family supported Trump. The officers extended the political characterization beyond the person Terri had accused. Plaintiffs allege that it included Anna. The homeowners and workers had never met or associated with Anna. The officers had not met Anna before she answered the door and had not questioned her about her political affiliation.

32.

Leif did not come to the door from inside the house. He returned from walking the dog and encountered the officers outside. Harper handed him the citation and stated the court date, then said, "That way you can talk to the judge like you said." Leif had requested information and the offered report-request phone number to pursue a restraining order against the workers as a petitioner seeking protection. The citation required him to appear as a criminal defendant.

33.

Leif told Harper the citation was illegible. Harper responded that the court date was legible and again pressed for a conversation. Explaining the trespass charge, she repeated that Leif had been told on June 23 not to return to the property. She also referred to a direction to leave given through a Ring camera and said, "Therefore, I'm charging you." She omitted the immediate instruction to stay described in paragraph 39. Her later correction of the supposed police exclusion is described in paragraph 40.

34.

After receiving the citation and Miranda warnings, Leif gave a coerced statement under the pressure described above. Kyaw interrupted that statement with the false assertion that police had already excluded Leif from the property on June 23. Harper and Kyaw repeatedly used that supposed police exclusion to press compliance and further conversation.

35.

Neither officer asked Leif whether he was struggling with his mental health or needed assistance. Before Kyaw's command, Leif had refused to speak three times: "I have nothing to say to you" at the initial contact, followed by "No" and "No" in the later encounter described in paragraph 16. Despite their mental-health speculation, the officers' conduct included that command, repeated false assertions of a police-issued exclusion, dismissal of Anna's questions, and agreement about grabbing Leif. The officers ultimately heard Leif's statement after issuing the citation, as described in paragraph 34.

**THE OFFICERS' REPORTS**

36.

Harper reported that Leif "demanded" the workers' information "so he could press charges and get a restraining order." Leif's recorded request concerned obtaining a police report for a restraining order. The additional purpose of pressing criminal charges does not appear in that exchange. Harper's report retained his refusal to give a statement and his reference to a judge, but omitted her offer of a phone number for obtaining the report and his clarification that he wanted that number. Kyaw's report described the phone-number request and restraining-order purpose without attributing a request to press charges. Harper separately acknowledged providing business cards with the incident number.

37.

Kyaw's report recorded Leif's initial refusal to speak when he requested the number. For the later encounter, it described an attempted conversation and recorded Leif's objection, "you don't get to tell me what to do." It omitted the two "No" answers and Kyaw's ensuing "Well, come over here" command. It also omitted Kyaw's follow-up explanation that the officers had received a call about Leif making "questionable choices" and were trying to figure it out. Those omitted statements before and after the command concerned obtaining a conversation.

38.

Harper reported that Leif admitted approaching and chest-bumping a worker. Leif did not make that admission. Kyaw's report of the same statement recorded the worker approaching and chest-bumping Leif. Harper cross-referenced Kyaw's statement but reported the opposite direction of contact. Plaintiffs allege that Harper deliberately falsified that material admission and materially distorted Leif's request through the omissions described in paragraph 36.

39.

Immediately after initially being told to leave, Leif was told to stay because the owner's wife wanted to speak with him. Kyaw's report recorded the owner saying, "wait my wife wants to talk to you." Harper's account of Terri's statement also acknowledged that she wanted to speak with Leif. Harper omitted that immediate qualification when explaining the trespass charge to Leif, as described in paragraph 33.

40.

The earlier report was dated June 23 but concerned incidents on June 2 and June 4. Harper later recorded that she had initially believed police directly excluded Leif and, after rereading the earlier report, corrected the source of the reported exclusion to the neighbor, Terri.

Harper left the trespass citation in place after correcting the source of the exclusion on which she had relied.

41.

PPB Directive 0900.00 required accurate, objective reporting of statements and police actions and a complete investigative chronology. Harper's body camera shows some phone-video viewing before citation, direct worker interviews, and injury questions. It also records uncertainty about whether contact was captured and arrangements to upload recordings. Her report did not identify which footage she reviewed before citation. The narrative bears a September 2, 11:03 a.m. date and time. The evidence audit records the September recordings uploaded at 12:00:53 p.m., accessed by Harper at 10:16:32 p.m., and downloaded at 10:16:39 p.m. that night, Pacific time. These events establish later access to the fuller recorded encounter, not the extent of playback or a complete report-edit history. The produced report retains the material discrepancies described above, and the produced records contain no later Harper explanation reconciling them. Plaintiffs allege that a reasonable investigation would have compared the available recordings with the attributed admission, the leave-then-wait instruction, and the procedural information request, and corrected or explained the conflicts. The failure to reconcile those specific conflicts, despite access to the evidence, is the reporting deficiency alleged here.

42.

Both reports recorded Leif's nonpolitical explanation concerning dust and the workers' conduct. Neither report included Harper's political characterization, Kyaw's mental-health speculation or the discussion about grabbing Leif. Neither disclosed the earlier telephone exchange through which Harper received the political and ethnicity allegations or her responses

adopting them as possible explanations. Harper's report also attributed the "bear hug" comparison to the worker without identifying her own introduction of that wording, described in paragraph 15.

43.

Harper's report included Terri's account of the later door visit, the locked door and telling Leif that police were coming. It omitted Terri's description of Leif answering normally, his "Just checking" response and her confirmation that he wanted police assistance to seek a restraining order. That omission removed material context known to Harper before her initial contact with Leif. The reports also omitted the earlier political and mental-health discussion and Kyaw's agreement about a "time out," "reality check" and longer confinement.

**PLAINTIFFS AND THEIR INJURIES**

44.

Leif is a middle-aged white man. Both Plaintiffs are registered Democrats. Leif voted for Joe Biden in 2020 and Kamala Harris in 2024 and contributed to Sarah Iannarone's mayoral campaign, a challenge from the left emphasizing police accountability and ending homelessness.

45.

The officers' coercion, false assertions, and misleading reporting caused Leif severe emotional distress and humiliation. The criminal citation and the prospect of defending against accusations supported by a false reported admission compounded that distress. He sought psychiatric assistance and began new medication to cope.

46.

Leif has pre-existing atrial fibrillation, which made the stress especially burdensome. Heart monitoring is planned for November 2026 to evaluate possible relapse.

47.

Harper's interruptions, accusations, and armed presence made Anna feel unsafe in her home. Anna perceived Harper as close to losing control and feared that the officers would force entry to look for Leif because they mistakenly believed he was inside. The encounter caused continuing severe distress: Anna resumed therapy, developed sleep problems and fear of police, has difficulty handling conflict, and finds keeping up with work responsibilities burdensome.

**FIRST CLAIM — FIRST AMENDMENT RETALIATION**

**42 U.S.C. § 1983 — Leif against Harper and Kyaw**

48.

Leif incorporates paragraphs 1–47. His criticism of the officers and efforts to obtain information to pursue his own complaint and protection were protected expression and petitioning activity under the First Amendment. His refusals to participate in the requested voluntary conversation provide the immediate context for the officers' ensuing commands and his criticism of their authority.

49.

Acting under color of state law, Kyaw used his command and repeated false police-exclusion assertions to pressure Leif after he declined conversation and challenged police authority. Harper used the repeated false assertions and deliberate misstatements of Leif's requests and admission to punish his criticism and efforts to pursue his own complaint. Harper

also described Leif as “very fixated” to the homeowners and workers while omitting his stated restraining-order purpose, as described in paragraph 15. After Leif challenged the command, Kyaw said, “I should’ve just grabbed him,” and Harper agreed, “I know, yeah.” The subsequent coercion and material reporting distortions are the retaliatory acts alleged here; Harper’s earlier expectation of a citation was formed before that criticism. Plaintiffs challenge the alleged false premises and reporting distortions underlying the enforcement, not the mere use of “charging” to describe issuing a criminal citation subject to prosecutorial review. Leif’s protected activity was a substantial or motivating factor in each officer’s retaliatory conduct. Harper’s treatment was also motivated by her attribution of political affiliation to Leif. Plaintiffs allege that she credited Terri’s political characterization as an explanation for Leif’s conduct and continued using it after interviewing the workers without obtaining confirmation, as described in paragraphs 5, 12, and 29–30.

50.

The coercive use of police authority and deliberate material falsification would deter a person of ordinary firmness from continuing protected expression or petitioning. Each officer personally participated in the acts attributed to that officer above, thereby depriving Leif of First Amendment rights and causing the injuries described in paragraphs 45–46. Leif seeks relief under 42 U.S.C. § 1983.

**SECOND CLAIM — PERCEIVED POLITICAL AFFILIATION**

**42 U.S.C. § 1983 — Anna against Harper**

51.

Anna incorporates paragraphs 1–7, 12, 15, 18–31, 44, and 47. The First Amendment protects political expression and association against retaliatory government coercion. Harper's belief that Anna shared the political affiliation Harper attributed to Leif was a substantial or motivating factor in Harper's intimidating treatment of Anna at her home.

52.

Harper used her police authority in the accusatory encounter described in paragraphs 18–25 to intimidate Anna because of that perceived affiliation. In the context of armed officers insisting that Leif was inside, that coercion would deter a person of ordinary firmness from political expression or association. Harper acted under color of state law, personally deprived Anna of her First Amendment rights, and caused the injuries in paragraph 47. Anna seeks relief under 42 U.S.C. § 1983.

**THIRD CLAIM — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Leif against the City of Portland**

53.

Leif incorporates paragraphs 1–47. Harper and Kyaw used the coercion and false police-exclusion assertions described above, together with Harper's deliberate material falsification, intending to cause Leif severe emotional distress as a means of punishment and pressure, or knowing that severe emotional distress was substantially certain to result. Kyaw's agreement about a "time out," "reality check" and longer confinement, followed by his "I should've just

grabbed him" remark and Harper's agreement, support the alleged punitive purpose of their conduct.

54.

That course of conduct was an extraordinary transgression of socially tolerable conduct. The officers exploited the officer–citizen power relationship to press statements through false claims of police authority and to place a fabricated incriminating admission in an official report. PPB Directives 0310.00, 0310.50, 0320.00, 0344.05, and 0900.00 required professional, truthful, unbiased conduct and accurate reporting. Directive 0850.20 addressed engagement without escalation when signs of mental illness were recognized; Directive 1010.00 required feasible proactive de-escalation. The challenged acts exceeded legitimate investigation and reporting.

55.

The officers' conduct caused Leif the severe emotional distress and injuries described in paragraphs 45–46. Each officer acted within the scope of City employment. The City is liable for the resulting Oregon tort damages under ORS 30.265.

**FOURTH CLAIM — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**Anna against the City of Portland**

56.

Anna incorporates paragraphs 1–7, 12, 15, 18–31, 44, 47, and 54. Harper used the accusatory encounter at Anna's home to intimidate her, intending severe emotional distress or knowing that severe emotional distress was substantially certain to result.

57.

Harper's conduct was an extraordinary transgression of socially tolerable conduct in the officer–citizen relationship. She directed the armed confrontation at an uninvolved resident working at home, rejected Anna's truthful account of Leif's absence, cut off her questions, and pressed criminal accusations under a false assertion of prior police exclusion. This abuse caused Anna the severe emotional distress and injuries described in paragraph 47. Harper acted within the scope of City employment, making the City liable under ORS 30.265.

**DEMAND FOR RELIEF**

58.

Plaintiffs demand $3,500,000 in compensatory damages, allocated according to their respective injuries and defendants' liability, without duplicate recovery; nominal damages for established federal violations without proven compensable injury; taxable costs; and lawful interest. Oregon tort recovery is subject to applicable statutory limits. Plaintiffs demand a jury trial.

Dated: October 26, 2026

Signature: /s/ Leif M. Schjeide

Leif M. Schjeide, Plaintiff, self-represented
4316 NE 11th Avenue, Portland, OR 97211
lschjeide@gmail.com | (863) 485-0082

Dated: October 26, 2026

Signature: /s/ Anna Pospeshnaya

Anna Pospeshnaya, Plaintiff, self-represented

4316 NE 11th Avenue, Portland, OR 97211

anna.pospeshnaya@gmail.com | (863) 485-0323